UNITED STATES DISTRICT COURT

SOUTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| RICHARD J. RAMIREZ JR.,<br><br>                          Petitioner,<br><br>v.<br><br>R. ARIAS, Warden, et al.,<br><br>                          Respondents. | Case No.: 25-cv-2599 WQH (JAC)<br><br>**ORDER (1) DENYING FIRST AMENDED PETITION FOR A WRIT OF HABEAS CORPUS AND (2) DENYING CERTIFICATE OF APPEALABILITY** |

HAYES, Judge:

## I.      INTRODUCTION

Richard Jack Ramirez, Jr. ("Petitioner") is a state prisoner proceeding pro se and in forma pauperis with a First Amended Petition ("FAP") for a Writ of Habeas Corpus filed under 28 U.S.C. § 2254. (ECF No. 5.) Petitioner challenges his 2021 conviction in San Diego Superior Court, Case Number SCN421603 following a jury trial on one count of first-degree murder with an enhancement for personal use of a deadly or dangerous weapon. (ECF No. 12-1 at 245–46.)

The FAP presents four alleged violations of his federal constitutional rights. (FAP 6–9.) Respondent has filed an Answer opposing relief and has lodged the trial record. (ECF Nos. 11–12.) For the reasons discussed below, this Court denies Petitioner's claims for habeas relief on the merits.

## II.   STATE COURT PROCEEDINGS

### A.   Factual Background

Following jury selection, trial began on December 13, 2021, in the San Diego County Superior Court. (ECF No. 12-6.)

The following facts are taken from the state appellate court opinion[1] affirming the judgment in *People v. Ramirez*, No. D080498, 2024 WL 1188835 (Cal. Ct. App. Mar. 20, 2024), review denied (June 12, 2024) (*See* ECF No. 12-21 at 2–23.)

> On February 5, 2021, [Gabriela Vicars,] a motorist[,] was stopped at an intersection in Oceanside. She saw the driver of a pickup truck, later identified as [Jose Ruiz], slowly roll back into [Petitioner] Ramirez's pickup truck. Ramirez appeared angry, quickly exited his truck, and banged on [Ruiz]'s window. [Ruiz] drove off quickly.[2] Ramirez got in his truck and followed [Ruiz].
>
> [Ruiz] testified that he drove down the street and made two U-turns in an effort to "shake [Ramirez] off." Eventually, [Ruiz] parked across the street from his [Ruiz's] house, and Ramirez parked behind him. [Ruiz] exited his truck and Ralph Hermosillo, a worker of [Ruiz]'s, approached. An altercation ensued between Hermosillo and Ramirez. Referring to [Ruiz], Hermosillo told Ramirez something like, "That's my uncle," even though it was not true. [Ruiz] did not observe a machete or anything in Hermosillo's hands. Hermosillo pointed out that Ramirez's vehicle was not damaged, and directed Ramirez to the back of it. Shortly afterwards, [Ruiz] saw Ramirez turn his hat backwards, and he heard a "thump." Hermosillo fell to the ground, and Ramirez kicked Hermosillo in the head. Ramirez returned to his truck and drove off.
>
> Both [Ruiz]'s neighbor and [Eric Moreno,] a visitor to the neighborhood[,] witnessed a portion of the altercation. They testified Hermosillo had no machete or other weapon in his hands, and they saw none near his body following the incident. Responding to a 911 call, police arrived at the scene, where Hermosillo died within minutes.

---

[1] In habeas proceedings, state court factual findings are presumptively reasonable and entitled to deference in these proceedings. *See Sumner v. Mata*, 449 U.S. 539, 545–47 (1981).

[2] This encounter was observed by a nearby motorist, Gabriela Vicars, who reported it to authorities via a contemporaneous 911 call and testified a trial. ECF No. 12-7 at 48–70.

The medical examiner conducted an autopsy on Hermosillo and testified his cause of death was a stab wound to his neck and blunt force injury to his head. He stated Hermosillo's stab wound appeared to be inflicted by a double-edged knife. Hermosillo's blood tested positive for what the medical examiner stated was a "very high" level of methamphetamine.

Although they were not married, a woman identified at trial as Ramirez's "wife," [Oralia Cruz], testified she accompanied him in the vehicle that day. After the collision, they pursued [Ruiz] to his house. There, Ramirez approached [Ruiz]'s vehicle and told him, "Hey dude, all you had to do was pull over. All we need is your insurance." Then, "out of nowhere," Hermosillo came from across the street holding a machete and "bouncing on his toes." Hermosillo asked Ramirez, "You have a fucking problem with my uncle?" Ramirez stepped back and replied, "Hey dude, your uncle just hit my fucking truck." As Hermosillo approached him, Ramirez ended up at the back of his truck. [Cruz] heard a "smacking" noise and, "out of the corner of [her] eye," saw Hermosillo fall to the ground. Ramirez kicked Hermosillo. As they were driving away, she looked in the vehicle's rear view mirror and saw [Ruiz] throwing a machete into the back of his truck.

[Cruz] testified at trial: "I have training. I'm a surgical tech. I know what to do. I didn't know [Hermosillo] was stabbed. I would have applied pressure. I would have given CPR."

On the night of the incident, an Oceanside police officer interviewed [Cruz], and a recording of the interview was played for the jury. [Cruz] told the officer that following the incident, she told Ramirez, "[Y]ou guys didn't have to fucking fight. You could have just fucking told the dude to fuck off and we could have left." Ramirez responded, "I'm a muthafuckin man."

On cross-examination, [Cruz] confirmed she telephoned Ramirez in jail on the night of the preliminary hearing and told him: "Well, I'm here for the fucking long run. So I just fucking go with it, whatever you want to do. That's—you know, I got you. I got your back regardless. You do what you want. You're a fucking smart man."

A police officer arrested Ramirez on the night of the incident. He recovered a pocketknife from him, but did not yet know about the stabbing. The officer put the knife in the back of Ramirez's truck, which was impounded and towed away. The knife was never recovered.

Ramirez testified at trial and admitted stabbing Hermosillo in the neck with a multi-tool instrument called a Leatherman, which was compared to a Swiss Army knife. Ramirez said that at the start of the altercation, his wife told him, "Babe, he's got a machete." Ramirez saw Hermosillo making threatening moves with the machete. Ramirez told Hermosillo to put the machete down, but he swung at Ramirez. Fearing for his life, Ramirez stabbed him in self-defense. Ramirez also admitted kicking Hermosillo in the head afterwards. When asked why he did that, he replied, "To make sure, you know, that he's stopped." Ramirez did not tell his wife he had stabbed Hermosillo because "she stresses a lot." Ramirez conceded that a Leatherman does not have a double edge, and the medical examiner testified that Hermosillo was stabbed with a double-edged blade.

On cross-examination, the prosecutor asked Ramirez about the circumstances surrounding his arrest. Specifically, when the police officer asked him separate questions about the collision and the stabbing incident, Ramirez twice responded, "I don't know nothing." Ramirez admitted that he had lied to the officer both times.

In rebuttal, the prosecution played a portion of a video of Ramirez's police interview. The prosecutor asked the interviewing officer if Ramirez's demeanor remained the same "throughout that evening." The officer replied, "Yes, it was like what we saw in the video there. He was just apathetic and indifferent to what I had to say, really."

2024 WL 1188835, at *1–2.

**B.      Jury Instructions**

The presentation of evidence concluded on December 20, 2021. (ECF No. 12-11 at 81.) By the morning of December 21, 2021, the court completed a final charging conference with the parties. (ECF No. 12-11 at 83–103; ECF No.12-12 at 7.). It then instructed the jury on "murder in the first degree, murder in the second degree, voluntary manslaughter, and involuntary manslaughter." (ECF No. 12-12 at 11; *see also id.* at 24–33.) Instructions offered various theories that would support second degree murder and manslaughter offenses. First, "[p]rovocation may reduce a murder from first degree to second degree and may reduce a murder to manslaughter." (ECF No. 12-12 at 28.) Second, an offense "that would otherwise be murder is reduced to voluntary manslaughter if the

25cv2599 WQH (JAC)

defendant killed someone because of a sudden quarrel or in the heat of passion." (ECF No. 12-12 at 29.) Third, an offense is reduced to voluntary manslaughter if "the defendant killed a person because he acted in imperfect self-defense." (ECF No. 12-12 at 30.) The court explained that the "difference between complete self-defense and imperfect self-defense depends on whether the defendant's belief and the need to use deadly force was reasonable." *Id.* Self-defense is imperfect when "the defendant actually believed" (1) "that he was in imminent danger of being killed or suffering great bodily injury," and (2) "that the immediate use of deadly force was necessary to defend against the danger, but . . . at least one of those beliefs was unreasonable." *Id.*

Fourth, the jury was instructed that an offense amounts to involuntary manslaughter if the defendant "commits an unlawful killing but does not intend to kill and does not act with conscious disregard for human life." (ECF No. 12-12 at 31.) The instructions specifically indicated that involuntary manslaughter had the following elements: "One, . . . the defendant committed a crime of battery; two, the defendant committed the crime with criminal negligence; and three, the defendant's acts caused the death of another person." (ECF No. 12-12 at 31–32.)

It also instructed the jury on the theory of complete self-defense, defense of others, and the allegation of personal use of a deadly weapon, the knife. (ECF No. 12-12 at 33–35.)

### C.    Closing Arguments

Once the court had finished instructing the jury, the parties presented closing arguments. (ECF No. 12-12 at 40.) The prosecution began by telling the jury as follows: "What we have before us is two drastically different version of events. Okay. We have the story of the defendant's testimony yesterday and last week and his wife's testimony. That story talks about self-defense and if you believe that story in light of all the other . . . evidence, then yes, this is a justified act of self-defense." *Id.* at 42. In contrast, the prosecution argued, was "the rest of the evidence[,] and all of the other evidence tells a

very different story. We have the testimony of Gabriela Vicars, . . . Jose Rios" and others. *Id*.

As part of the competing story, the prosecution included the "defendant's wife initial statement, at least 90 percent of that," and "the defendant's initial statement." *Id*. That version of events "points to—that this was the defendant being upset, being angry, losing his cool, and ruining the Hermosillo family and his own family in a selfish act of rage." *Id*.

The prosecution, after asserting that the defendant and his wife, Oralia Cruz, suffered biases in their testimony, posited that the testimony of Moreno, who had been visiting Ruiz's neighborhood, was "very damaging to the defense case" as was that of Vicars, who "shed[] light clearly on what this fender-bender looked like." *Id*. at 43.

Returning to Cruz's testimony, the prosecutor contrasted Cruz's in-court testimony with her statement to police the day of the killing: "How convenient that those are the details that are needed to support a self-defense claim?" *Id*. at 45. After arguing that Petitioner was guilty of first degree murder, the prosecutor directed his argument against the lesser offenses. With respect to heat of passion, the prosecution indicated the following:

> It doesn't apply here. What does this look like when it does apply? This looks like when you come home and walk in on one of your neighbors molesting your kid in the act and the father blows up[,] takes it a little too far, blows the guy away or breaks his neck or whatever he does, and we as the community we say, "You know what? You can't have that. I mean, but we get it. It makes sense." So we're . . . going to negate the malice. We're going to cut him a break because the average reasonable person would have just seen red based on that provocation and lost it and acted. That's not what happened here.

*Id*. at 58.

The defense's closing argument then focused largely on the credibility and vantage point of witnesses, suggesting various government witnesses either were lying or could not see events that would have justified Petitioner's actions. *Id*. at 62–93, 98. Defense counsel emphasized that "the prosecution has to prove beyond a reasonable doubt that Richard Ramirez did not act in self-defense." *Id*. at 95. In the end of defense counsel's summation, counsel asked a series of questions he believed pointed to reasonable doubt. This included:

"Why didn't police collect and test the Leatherman multi-tool? Maybe Mr. Hardy [the prosecutor] should have asked Detective Keys why that was not done. [¶] [The prosecutor] does not believe that's an important point at all. I think it's very important and you should too. What is the answer to that question? Why didn't police collect and test the Leatherman tool?" *Id.* at 99.

The prosecution then elected to present a rebuttal argument. *Id.* at 111. The prosecutor quickly responded to the defense's raising the issue of the authorities' loss of the Leatherman tool, and the following exchange took place:

> The Prosecution: And then this knife issue, we keep coming back to that and I made some questions—asked some questions during my direct with Detective Keys and I got objected to as if I was shifting the burden. So I want to be very, very clear. I am not shifting the burden here. I know what the burden is very well. I accept that burden. I take that burden on. Okay. What I'm saying is if there was any evidentiary value that was helpful to the defense they have prosecutors—
>
> Defense Counsel: Objection, Your Honor. Shifting the burden.
>
> The Court: Ladies and gentlemen, what the attorneys say during argument is not evidence. They may argue the case based on the evidence presented in the trial and reasonable inference is drawn therefrom. It is up to you to determine whether the arguments of counsel are supported by the evidence presented at the trial. That question I did sustain an objection back at the time of the trial and so the jury was—the jury is to disregard that question and what the answer would have been. And so I'll just ask the People to move on to the next point.

*Id.* at 105.

The prosecutor's final words drew jurors' attention to the reasonable doubt standard:

> So how do you know this case has been proved beyond a reasonable doubt? Inevitably, somebody after this is going to ask you "What was that trial about you just sat through for two weeks," right, Christmas dinner or whatever it may be? And what are you going to tell them? "It's about this poor guy named Mr. Ramirez, ex-con. He just was misunderstood and this sinister retirement community had it out for him and conspired, and thank God we were there to instill justice in the situation"? Of course not; right? You're going to say "This is a crazy case about this guy who lost it over something so silly, and when a

25cv2599 WQH (JAC)

young man came over to try to get in between him and his elderly uncle, he got killed brutally and then he got thrown through the wringer more than one time, but we sat through it all." That's how you know that this case has been proved beyond a reasonable doubt.

*Id.* at 111.

### D.   Deliberations and Jury Questions

Following the prosecution's rebuttal argument, and after final procedural instructions from the court, the jury was sent to deliberate starting in the afternoon of December 21, 2021. *Id.* at 114.

On the second day of deliberations, December 22, 2021, the jury sent a note requesting the recording from 911 call from Gabriela Vicars," the witness who testified to seeing the initial confrontation between Petitioner and Ruiz; the jury also asked for a "written transcript" of the call. (ECF No. 12-13 at 4.) Since no call or transcript had been introduced, the Court responded as follows: "A recording of a 911 call from Gabriela Vicars was not introduced into evidence. A 911 call was made by Gabriela Vicars's passenger. The recording of that call was not introduced into evidence and not available for you to review." (ECF No. 12-13 at 8.)

A second note from the jury that day requested "the entire and complete interview between Ms. Cruz and Detective Keys." *Id*. That interview also had not been introduced even though both counsel had "talk[ed] about the interview" during trial. *Id.* The jury was therefore instructed that its "verdict must be based only on the evidence that was presented at this trial. Please refer to testimony of Ms. Cruz, Detective Keys, and any audio or video that was introduced into evidence. You are not to speculate what may be in other recordings or why only specific portions of the interview [were] introduced." *Id.* at 11.

Unable to reach a verdict on the second day, the jurors were ordered to return to continue deliberating on a third day, December 27, 2021, on which they reached a verdict. (ECF No. 12-14 at 4–5.)

25cv2599 WQH (JAC)

**E.    Verdict, Motion to Vacate Conviction, and Sentencing**

On December 27, 2021, the jury found Petitioner guilty of one count of first-degree murder in violation of Cal. Penal Code § 187(a) and found true the enhancement for personal use of a knife within the meaning of Cal. Penal Code § 12022(b)(1). (ECF No. 12-1 at 172; ECF No. 12-14 at 5.) In a bifurcated proceeding, Petitioner admitted he suffered three prior strike convictions and two prior serious or violent felony convictions under the "Three Strikes" law. Cal. Pen. Code §§ 667(a)(1), (b), 668, 1170.12(b), (c)(1), 1192.7(c). (ECF No. 12-15 at 4–9.)

In written motion and at his June 1, 2022 sentencing hearing, Petitioner moved the court to vacate his first degree murder conviction and instead replace it with a conviction for voluntary manslaughter or second degree murder. (ECF No. 12-16 at 8–14.) Defense counsel argued the first degree murder punishment would be excessive based on the offense. *Id.* at 13–14. Counsel noted that during plea negotiations the defense had offered a plea deal to the prosecution in the "upper end of the single digits or lower double digits" and the prosecution had "countered with 23 years." *Id.* at 13–14. The court denied the motion. *Id.* at 19–20. The trial court sentenced Petitioner to 75 years to life plus an additional year for the knife-use enhancement. (ECF No. 12-1 at 245; ECF No. 12-16 at 34.)

**F.    Direct Appeal – California Court of Appeal**

On direct appeal to the state appellate court, Petitioner raised five claims. (ECF No. 12-18.) On March 20, 2024, the California Court of Appeal affirmed the judgment in a reasoned opinion. (ECF No. 12-21.)

**G.    Petition for Review – California Supreme Court**

Petitioner thereafter filed a petition for review raising four claims in the California Supreme Court. (ECF No. 12-22.) On June 12, 2024, the California Supreme Court

25cv2599 WQH (JAC)

summarily denied the petition in an order without comment or citation, stating: "The petition for review is denied." (ECF No. 12-23.)

### H. Federal Proceedings

Petitioner filed his federal petition on September 4, 2025. (ECF No. 1 at 13.) Petitioner alleges his federal constitutional rights were violated by: (1) the prosecution's misstatement during closing argument regarding its burden of proof at trial, (2) the trial court's failure to provide a unanimity instruction to the jury, (3) the trial court's admission of evidence of a lack of remorse based on Petitioner's demeanor while he was in post-arrest custody, and (4) additional purported instances of prosecutorial misconduct during closing argument and cross-examination of Petitioner. (FAP 6–9.)

On October 20, 2025, the Court dismissed the Petition without prejudice and with leave to amend for failure to satisfy the filing fee requirement. (ECF Nos. 3–4.) On November 4, 2026, Petitioner filed a First Amended Petition ("FAP"), alleging four enumerated grounds, which Respondent treats as five claims,[3] which they concede are the same claims Petitioner exhausted in his petition for review before the California Supreme Court. (*See* ECF No. 11-1 at 7 ("Ramirez's First Amended Petition raises the same claims" as his petition for review "and at least two of them nominally discuss the uniformity of law in California, which is not a federal question. . . . But [Respondent] will respond to the merits of the claims as identified by counsel in the petition for review itself.") (citations omitted)). On February 18, 2026, Respondent filed an answer and lodged the state court record. (ECF Nos. 11–12.)

Petitioner was provided a March 19, 2026 deadline for a Traverse. (ECF No. 10.) No traverse has been received by the Court.

---

[3] While the FAP separates claims across for enumerated sections, Respondent's Answer indicates that Respondent understands Petitioner to have raised "five" claims. (ECF No. 11-1 at 7.)

25cv2599 WQH (JAC)

## III.   DISCUSSION

### A.   Procedural Default

Respondent asserts that two prosecutorial misconduct sub-claims are procedurally defaulted. (ECF No. 11-1 at 11.) Procedural default is an affirmative defense that Respondent bears the ultimate burden of proving. *See Gray v. Netherland*, 518 U.S. 152, 165 (1996); *Bennett v. Mueller*, 322 F.3d 573, 585–86 (9th Cir. 2003). Under the doctrine of procedural default, federal courts generally cannot review a habeas petitioner's claim if the "state court declined to address a prisoner's federal claim[] because the prisoner had failed to meet a state procedural requirement." *Martinez v. Ryan*, 926 F.3d 1215, 1224 (9th Cir. 2019) (quoting *Coleman v. Thompson*, 501 U.S. 722, 730 (1991)).

Procedural default does not apply, however, unless "the application of the state procedural rule . . . provide[s] 'an adequate and independent state law basis' on which the state court can deny relief." *Park v. California*, 202 F.3d 1146, 1151 (9th Cir. 2000) (quoting *Coleman*, 501 U.S. at 729–30). And as the Supreme Court instructed in *Coleman*, "federal habeas courts must ascertain for themselves if the petitioner is in custody pursuant to a state court judgment that rests on independent and adequate state grounds." 501 U.S. at 736. With respect to habeas claims implicating ineffective assistance of counsel, courts must be "particularly vigilant in scrutinizing the adequacy of state rules of procedural default which have the effect of barring federal habeas review" of such claims. *Hoffman v. Arave*, 236 F.3d 523, 529 (9th Cir. 2001) (internal quotation marks and citation omitted).

Here, "[b]ecause the California Supreme Court denied review of" Petitioner's "habeas petition without comment," this Court "look[s] through the unexplained California Supreme Court decision to the last reasoned decision . . . as the basis for the state court's judgment." *Gill v. Ayers*, 342 F.3d 911, 917 n.5 (9th Cir. 2003) (internal quotations omitted). Respondent's procedural default argument originates in the California Court of Appeal opinion (the last reasoned decision), which Respondent reads as having "held that" Petitioner "forfeited two allegations of prosecutorial misconduct due to a failure to object at trial." (ECF No. 11 at 5; ECF No. 11-1 at 11.)

It is true that forfeiture by failure to object in California state court may render a Petitioner's claim procedurally defaulted. *See Zapata v. Vasquez*, 788 F.3d 1106, 1111–12 (9th Cir. 2015) (finding claim procedurally defaulted under California's contemporaneous objection rule). But it is also true that when "a state appellate court overlooks the procedural default and considers an objection on the merits, the state has not relied on the procedural bar and the federal courts may review the claim." *Id.* (citation omitted). Further, "unless a [state] court expressly (not implicitly) states that it is relying upon a procedural bar," courts "must construe an ambiguous state court response as acting on the merits of a claim, if such a construction is plausible." *Chambers v. McDaniel,* 549 F.3d 1191, 1197 (9th Cir. 2008); *see also Koerner v. Grigas*, 328 F.3d 1039, 1052 (9th Cir. 2003) (Where state court order cites multiple grounds, of which not all would bar federal review, without specifying which bar or bars apply to which claims, and "if it is impossible for the federal court to ascertain whether such grounds have been relied upon, the state court decision cannot bar federal review."); *Loveland v. Hatcher,* 231 F.3d 640, 643 (9th Cir. 2000) (holding that, when "reliance upon [the state court's] procedural bar rule was an independent and alternative basis for its denial of the petition, review on the merits of the petitioner's federal constitutional claim in federal court is precluded").

In the proceedings cited by Respondent, the California Court of Appeal did not specify that it was relying on the state forfeiture rule. Indeed, following its forfeiture determination, the state appellate panel exercised discretion to review all prosecutorial misconduct claims. (ECF No. 12-21 at 10.) In reaching the merits, the panel observed that "Ramirez preemptively argue[d] trial counsel rendered ineffective assistance by failing to object to the prosecutor's arguments and statements." (ECF No. 12-21 at 10.) Under California state law, it is well-settled that the panel possessed such discretion to reach the merits if it wished to. *People v. Williams*, 17 Cal. 4th 148, 161 n.6 (Cal. 1998) (noting appellate courts' established authority to reach a forfeited issue).

The California Court of Appeal does not suggest that its merits evaluation amounts to a decision on an *alternative* ground, as Respondent contends. Rather, the panel made the

25cv2599 WQH (JAC)

following unqualified determination in response to Petitioner's ineffective assistance of counsel argument: "Thus, despite the forfeiture, we will address the merits of Ramirez's claims." 2024 WL 1188835, at *4. Respondent did not seek rehearing in the state appellate court or otherwise challenge the panel's decision to conduct its review on the merits. Once the California appellate court denied relief, it cannot be said that it "declined to address" the claim because Petitioner "failed to meet a state procedural requirement." *Martinez*, 926 F.3d at 1224.[4]

Further, the California Courts of Appeal know how to indicate a ruling is hypothetical as in *Gomez*, and they know how to indicate that ineffective assistance of counsel has not been demonstrated to excuse a forfeiture. *See, e.g.*, *People v. Holliday*, 104 Cal. App. 5th 536, 557 (Cal Ct. App. 2024) (Appellant "must demonstrate that trial counsel's performance was deficient *and* that but for this deficient performance, there is a reasonable probability the outcome of the proceeding would have been different. . . . Neither prong has been demonstrated here." (citation omitted)). Indeed, when adjudicating Petitioner's prosecutorial misconduct claims on the merits, the appellate panel noted Petitioner's ineffective assistance of counsel argument, discussed the applicable standard, and then proceeded to address the prosecutorial misconduct arguments on their merits. *See* 2024 WL 1188835, at *4–5.

Application of procedural default rules, therefore, require that this Court reject Respondent's argument that any of Petitioner's claims were rendered defaulted when the California Court of Appeal excused Petitioner's forfeiture and reached their merits.

---

[4] Respondent does not argue that the California Court of Appeal's thorough merits analysis was merely hypothetical as is often the case when a court states it *would* rule against an appellant on the merits had appellant not failed to meet procedural requests. *See, e.g.*, *People v. Gomez*, 118 Cal. App. 5th 384, 392 (Cal. Ct. App. 2026) ("[W]e need not rely solely on forfeiture because even if we were to consider the merits of [Appellant's] assertions, we *would* not find that [Appellant] has established a" reversible error.). After all, "[t]he modal verb 'would[]' . . . expresses 'a possible situation that has not happened' or that one is "imagining." *Marchek v. United Servs. Auto. Ass'n*, 118 F.4th 830, 835 (6th Cir. 2024) (citing *Would*, The Britannica Dictionary, https://perma.cc/4T7Q-T468).

13

25cv2599 WQH (JAC)

*See NAACP v. Alabama ex rel. Flowers,* 377 U.S. 288, 296 (1964) (holding that federal review is not precluded if procedural rule invoked by state court does not apply to the facts of the case); *Harris v. Reed,* 489 U.S. 255, 263 (1989) (The state court must "clearly and expressly state[] that its judgment rests on a state procedural bar" in order for federal review to be precluded. (internal quotations omitted)).

**B.      Standard of Review**

Under the Antiterrorism and Effective Death Penalty Act of 1996 (AEDPA), a federal court cannot grant a petition for a writ of habeas corpus unless the relevant state court adjudication: "(1) resulted in a decision that was contrary to, or involved an unreasonable application of, clearly established Federal law, as determined by the Supreme Court of the United States," or "(2) resulted in a decision that was based on an unreasonable determination of the facts in light of the evidence presented in the State court proceeding." *Harrington v. Richter*, 562 U.S. 86, 97–98 (2011) (quoting 28 U.S.C. § 2254(d)(1)–(2)).

A decision is "contrary to" clearly established law if "the state court arrives at a conclusion opposite to that reached by [the Supreme] Court on a question of law or if the state court decides a case differently than [the Supreme] Court has on a set of materially indistinguishable facts." *Williams v. Taylor*, 529 U.S. 362, 413 (2000). A decision involves an "unreasonable application" of clearly established federal law if "the state court identifies the correct governing legal principle . . . but unreasonably applies that principle to the facts of the prisoner's case." *Id.*; *Bruce v. Terhune*, 376 F.3d 950, 953 (9th Cir. 2004). With respect to section 2254(d)(2), "[t]he question under AEDPA is not whether a federal court believes the state court's determination was incorrect but whether that determination was unreasonable—a substantially higher threshold." *Schriro v. Landrigan*, 550 U.S. 465, 473 (2007) (citing *Williams*, 529 U.S. at 410). "State-court factual findings, moreover, are presumed correct; the petitioner has the burden of rebutting the presumption by 'clear and convincing evidence.'" *Rice v. Collins*, 546 U.S. 333, 338–39 (2006) (quoting 28 U.S.C. § 2254(e)(1)).

25cv2599 WQH (JAC)

"A state court's determination that a claim lacks merit precludes federal habeas relief so long as 'fairminded jurists could disagree' on the correctness of the state court's decision." *Richter*, 562 U.S. at 101 (quoting *Yarborough v. Alvarado*, 541 U.S. 652, 664 (2004)). In other words, to establish that a state court decision rests on "an unreasonable application of clearly established Federal law" under § 2254(d)(1), a habeas petitioner must "establish that the state court blundered so badly that every fairminded jurist would disagree with the decision." *Klein v. Martin*, 607 U.S. 213, 220–21 (2026) (per curiam) (citation modified).

In a federal habeas action, "[t]he petitioner carries the burden of proof." *Cullen v. Pinholster*, 563 U.S. 170, 181 (2011) (citing *Woodford v. Visciotti*, 537 U.S. 19, 25 (2002) (per curiam)). "Prisoner pro se pleadings are given the benefit of liberal construction." *Porter v. Ollison*, 620 F.3d 952, 958 (9th Cir. 2010) (citation omitted).

### C.    Merits

Petitioner alleges his federal constitutional rights were violated by: (1) the prosecution's misstatement during closing argument regarding its burden of proof at trial, (2) the trial court's failure to provide a unanimity instruction to the jury, (3) the trial court's admission of evidence of a lack of remorse based on Petitioner's demeanor while he was in post-arrest custody, and (4) additional purported instances of prosecutorial misconduct during closing argument and cross-examination of Petitioner. (FAP 6–9.)

#### 1.    Claims 1 & 4

In Claims 1 and 4, Petitioner argues his "rights under the 'Federal Constitution'" were violated when the prosecution committed multiple acts of misconduct during the prosecution's closing argument. First, he argues the prosecution misstated the applicable burden of proof by arguing its burden was met when "the jury rejects the defense's version of events." (FAP 6.) Second, he argues "the prosecutor shifted the burden by arguing that Ramirez should have [had] an investigator locate the multi-tool." *Id.* at 9. Third, he argues "the prosecutor misstated the law of heat of passion." *Id.* Fourth, he argues "the

prosecutor's references to Ramirez's alleged lack of remorse were misconduct." *Id.* This Court addresses each claim in turn.

### a. Clearly Established Law

It is clearly established that "[a] prosecutor's comments during closing argument do not violate the Constitution unless they 'so infected the trial with unfairness as to make the resulting conviction a denial of due process.'" *Hampton v. Shinn*, 143 F.4th 1047, 1088–89 (9th Cir. 2025) (quoting *Donnelly v. DeChristoforo*, 416 U.S. 637, 643 (1974)). "Improper prosecutorial argument generally should not result in reversal where the trial court instructed the jury that closing arguments are not evidence." *Id.* (citing *Darden v. Wainwright*, 477 U.S. 168, 182 (1986)) (additional citation omitted). As the Supreme Court has observed, the "arguments of counsel generally carry less weight with a jury than do instructions from the court." *Boyde v. California*, 494 U.S. 370, 384 (1990). "[T]he Supreme Court has emphasized that 'the *Darden v. Wainwright* standard is a very general one that leaves courts "more leeway . . . in reaching outcomes in case-by-case determinations[.]"'" *Rowland v. Chappell*, 876 F.3d 1174, 1189 (9th Cir. 2017) (citing *Parker v. Matthews*, 567 U.S. 37, 48, 132 (2012) (per curiam) (citation omitted)).

Even where a prosecutor's misconduct renders a trial fundamentally unfair, federal habeas relief is warranted only if the denial of due process based on that misconduct had a "substantial and injurious effect or influence in determining the jury's verdict." *Wood v. Ryan*, 693 F.3d 1104, 1113 (9th Cir. 2012) (quoting *Brecht v. Abramson*, 507 U.S. 619, 637–38 (1993).

### b. Misstatement of the Burden of Proof During Closing Argument

Here, the alleged misstatement came during the prosecution's rebuttal argument, wherein the prosecuting attorney stated as follows:

> Look, reasonable doubt is doubt based on reason and we talked about that at the beginning. You're going to have an abiding conviction because you now heard all the evidence and that's not going to change. So you're going to come [to] a conclusion based on the evidence you heard, put it in the context of common sense and reasonability [*sic*], and you come to a verdict. [¶] So how

do you know this case has been proved beyond a reasonable doubt? Inevitably, somebody after this is going to ask you "What was that trial about you just sat through for two weeks," right, Christmas dinner or whatever it may be? And what are you going to tell them? "It's about this poor guy named Mr. Ramirez, ex-con. He just was misunderstood and this sinister retirement community had it out for him and conspired, and thank God we were there to instill justice in the situation"? Of course not; right? You're going to say "This is a crazy case about this guy who lost it over something so silly, and when a young man came over to try to get in between him and his elderly uncle, he got killed brutally and then he got thrown through the wringer more than one time, but we sat through it all." That's how you know that this case has been proved beyond a reasonable doubt.

(ECF No. 12-12 at 111.)

Regarding Petitioner's burden shifting argument, the California Court of Appeal addressed the above paragraph by first identifying the correct standard for reversible constitutional error mentioned above. *See* 2024 WL 1188835 at *5 ("A prosecutor's conduct violates the federal Constitution when the conduct infects the trial with such unfairness as to make the conviction a denial of due process; that is, when the conduct is of sufficient significance to result in the denial of the defendant's right to a fair trial." (citation modified)); *Clements v. Madden*, 112 F.4th 792, 806 (9th Cir. 2024) (noting in affirming denial of § 2254 relief that the "state court identified the correct governing law for [the] claims").

The appellate panel then explained that, "considered in the context of the whole argument and the jury instructions, the jury in this case was not reasonably likely to understand the prosecutor's comments as diminishing the burden of proof." 2024 WL 1188835 at *7 (citation modified). The California Court of Appeal, therefore, held that, "even if the prosecutor erred, there was no prejudice given the instructions and entirety of the argument." *Id.* The appellate court's denial of this claim was neither contrary to, nor an unreasonable application of clearly established law. As the appellate court found, "[t]o the extent the prosecutor's statement was inconsistent with the instructions, the jury was instructed to follow the latter." *Id.* at *6–7.

17

25cv2599 WQH (JAC)

To be sure, the trial court verbally instructed the jury *before* the parties presented closing arguments, so the prosecution's rebuttal argument was heard just before the jury retired to deliberate. (ECF No. 12-12 at 39–40.) It nevertheless remains true that "[t]he court also instructed the jury . . . that the arguments of counsel [are] not evidence," and, as the California Court of Appeal correctly concluded, reviewing courts "must presume the jury followed those instructions." 2024 WL 1188835, at *6. "The Constitution [does not] require anything more" because a "jury is presumed both to follow its instructions." *Weeks v. Angelone*, 528 U.S. 225, 234 (2000) (citation omitted). In short, Petitioner fails to establish that every fair-minded jurist would disagree with the state court's determination here. *Klein*, 607 U.S. at 220–21.

### c. Shifting the Burden

In addressing Petitioner's second prosecutorial misconduct claim, the California Court of Appeal provided the following factual summary:

> Ramirez claims the prosecutor shifted the burden of proof to the defense, and points to a colloquy at trial in which the prosecutor asked a police officer about the Leatherman tool that disappeared after Ramirez's arrest. The prosecutor asked the officer whether the public defender's office has its own investigative team that can go out and hunt down evidence.[5] The court sustained defense

---

[5] After Detective Brent Keyes opined the Leatherman was not involved in the killing, the following exchange took place:

> Prosecution: In your opinion—do you have an opinion as to whether or not the Leatherman tool was involved in this stabbing?
> Keyes: My opinion is it was like the doctor had originally told us, that it was a—a double-edged knife or weapon of some sort, and in my experience, the Leatherman tools that I own, the blade that is on a Leatherman tool is a single-edged blade and not a double-edged blade, but I'm not a knife expert.
> Prosecution: Got it. And you didn't handle the Leatherman tool that disappeared with the defendant's truck after he was arrested; right?
> Keyes: Correct.
> Prosecution: Now, the public defender's office has their own investigative team; correct?
> Keyes: Yes, they do.
> Prosecution: They have their own investigators that can go out and hunt down evidence; right?
> Defense Counsel: Objection, Your Honor. Shifting the burden.
> The Court: Sustained.

(ECF No. 12-9 at 31–32.)

25cv2599 WQH (JAC)

counsel's objection that the prosecutor was shifting the burden of proof to the defense.

The prosecutor addressed this issue again during closing argument: "And then the knife issue, we keep coming back to that and I . . . asked some questions during my direct [examination] with [a detective] and I got objected to as if I was shifting the burden. So I want to be very, very clear. I am not shifting the burden here. I know what the burden is very well. I accept that burden. I take that burden on. Okay. What I'm saying is if there was any evidentiary value that was helpful to the defense they have prosecutors [*sic*]."

At that point, defense counsel objected that the prosecutor was shifting the burden to the defense. The court admonished the jury: "[W]hat the attorneys say during argument is not evidence. They may argue the case based on the evidence presented in the trial and reasonable inference[s] drawn therefrom. It is up to you to determine whether the arguments of counsel are supported by the evidence presented at trial. That question I did sustain an objection back at the time of trial and so the jury was—the jury is to disregard that question and what the answer would have been. And so I'll just ask the People to move on to the next point.

2024 WL 1188835, at *5.

The California Court of Appeal "conclude[d] the court properly sustained Ramirez's objection to the prosecutor's questioning of the police officer on the issue of burden shifting." *Id.* And as the appellate panel further reasoned, "when the prosecutor referred to that issue again in closing argument, he clarified he understood the People's burden. Defense counsel again objected, and the court admonished the jury that the arguments of counsel are not evidence." *Id.* Therefore, the California Court of Appeal held, "the court's admonition cured any prejudice to Ramirez, and thus this claim fails." *Id.*; *see also Drayden v. White*, 232 F.3d 704, 713 (9th Cir. 2000) (denying a petitioner's prosecutorial misconduct claim in part because "the court instructed the jury that '[s]tatements made by the attorneys during the trial are not evidence'").

The California Court of Appeal did not unreasonably hold that any potential prejudice was cured by the trial court's admonition in response to timely objection by defense counsel. *See Greer v. Miller*, 483 U.S. 756, 766 n.8 (1987) (stating that when a

curative instruction is issued, a court presumes the jury followed the instruction). Nor can it be said the alleged prosecutorial misconduct had a substantial and injurious effect or influence in determining the jury's verdict. *See Burks v. Borg,* 27 F.3d 1424, 1431 (9th Cir. 1994) (applying *Brecht* to prosecutorial misconduct claim).

### d.     Misstatement of Heat of Passion Law

Petitioner's argument that the prosecutor misstated the law on heat of passion comes from the following statement in the prosecution's closing:

> [Provocation] doesn't apply here. What does it look like when it does apply? This looks like when you come home and walk in on one of your neighbors molesting your kid in the act and the father blows up and takes it a little too far, blows the guy away or breaks his neck or whatever he does, and we as the community we say, "You know what? You can't have that. I mean, but we get it. It makes sense." So we're not—it's not malice. It's—we're going to negate malice. We're going to cut him a break because the average reasonable person would have just seen red based on that provocation and lost it and acted. That's not what happened here.

2024 WL 1188835, at *5. As with the errors mentioned above, the Court of Appeal correctly observed that the jury had properly been instructed regarding the legal principle at issue, curing any error made by the prosecutor. *Id.* at *6; *Weeks*, 528 U.S. at 226.

### e.     References to Lack of Remorse

For his final prosecutorial misconduct claim, "Ramirez contends the prosecutor erred by referring to his demeanor" during argument. 2024 WL 1188835, at 6; FAP 9. Unlike the first three misconduct errors, which the state court indicated were neutralized through proper instruction and admonishment, the California Court of Appeal held that "limited evidence on this topic was properly admitted." 2024 WL 1188835, at 6. And since "[t]he trial court sustained defense objections to certain of the prosecutor's comments," the state appellate court properly "presume[d] the jury followed the court's instructions and disregarded these comments." *Id.*; *see Weeks*, 528 U.S. at 226. A reasonable jurist could easily determine that the comments, addressed by properly sustained objections, did not

amount to the sort of error that infects the trial with such unfairness as to make the conviction a denial of due process.

### f.        Pattern of Prosecutorial Misconduct

Even liberally construing the FAP as arguing the above actions constituted a pattern of prosecutorial misconduct, (*see* ECF No. 12-22 at 43), Petitioner still has not shown the California Court of Appeal's decision amounted to an unreasonable application of clearly established federal constitutional law. As discussed above, the standard for granting habeas corpus relief on the basis of improper prosecutorial argument is extremely high. "The relevant question is whether the prosecutors' comments so infected the trial with unfairness as to make the resulting conviction a denial of due process." *Darden*, 477 U.S. at 181 (citations and internal quotation marks omitted) (denying relief on the basis of inflammatory prosecutorial argument). This is particularly true when a federal court reviews a case on habeas corpus, where the scope of review is "the narrow one of due process, and not the broad exercise of supervisory power." *Id.* (quoting *Donnelly*, 416 U.S. at 642).

Where the trial judge properly instructed the jury on the applicable burden of proof and law on the heat of passion and admonished the jury regarding portions of prosecutorial argument that may have been improper, the California Court of Appeal was correct to determine that any prejudice was cured. 2024 WL 1188835, at *5; *see Drayden*, 232 F.3d at 713.

It is worth noting that the jury spent multiple days deliberating, as "[l]onger jury deliberations weigh against a finding of harmless error because lengthy deliberations suggest a difficult case." *See United States v. Velarde-Gomez*, 269 F.3d 1023, 1036 (9th Cir. 2001) (en banc) (citation and internal quotation marks omitted)); *Kipp v. Davis*, 971 F.3d 939, 959 (9th Cir. 2020) ("[W]e find it compelling that the jury spent a few days in deliberations before returning a verdict."). Yet, as stated above, any prosecution remarks were minor and diffused by the court's correct instructions and admonishment following defense counsel's objections. *See Weeks*, 528 U.S. at 226; *Drayden*, 232 F.3d at 713. Thus,

21

even if combined, the prosecution's actions fall far short of having a substantial and injurious effect or influence in determining the jury's verdict. *Burks,* 27 F.3d at 1431; *Brecht,* 507 U.S. at 637.

In sum, the Court finds the state court's denial of Petitioner's prosecutorial misconduct claims set forth in Grounds 1 and 4 was neither contrary to nor an unreasonable application of clearly established law.

**2.      Claim 2**

In Claim 2, Petitioner asserts that the trial court violated his right under the Fourteenth Amendment to a unanimous jury by failing to provide the jury an instruction that they had to unanimously agree as to whether the stab or kick killed the victim. (FAP 7; ECF No. 12-22 at 22–27.)[6]

Here, the California Court of Appeal reasoned that "the continuous course of conduct exception to the unanimity instruction requirement applies" since "evidence showed Ramirez kicked Hermosillo immediately after stabbing him, and promptly left the scene." 2024 WL 1188835, at *7. Further, the state appellate panel added that Petitioner's "defense to both his stabbing and kicking was the same: he acted in self-defense." *Id.*

In both state and federal criminal trials, a jury cannot convict unless it unanimously finds that the prosecution has proved each element of an offense. *See Ramos v. Louisiana*, 590 U.S. 83, 93 (2020) ("There can be no question either that the Sixth Amendment's unanimity requirement applies to state and federal criminal trials equally."); *id.* (explaining the Sixth Amendment unanimity right is "incorporated against the States under the Fourteenth Amendment" (footnote omitted)). Where the state appellate court recognized the constitutional right to unanimity under *Ramos*, the court did not unreasonably apply

---

[6] Respondent understands Petitioner to incorporate his state petition for rehearing (ECF No. 12-22) into the FAP. (*See* ECF No. 11-1 (noting that the California Office of the Attorney General elected to "respond to the merits of the claims [presented by Petitioner] as identified by counsel in the petition for review itself.").)

25cv2599 WQH (JAC)

*Ramos* in holding that a more specific unanimity instruction was not required under "the continuous course of conduct exception."  2024 WL 1188835, at *7.

As the state appellate court correctly explained, the unanimous verdict "requirement is typically satisfied when the jury unanimously finds the defendant committed the alleged crime." *Id.* Only when "the evidence suggests more than one discrete crime" must the prosecution . . . elect among the crimes or the court must require the jury to agree on the same criminal act." *Id.* (citation and internal quotation marks omitted).

Similarly, the U.S. Supreme Court instructs that a jury "need not always decide unanimously which of several possible sets of underlying brute facts make up a particular element, say, which of several possible means the defendant used to commit an element of the crime." *Richardson v. United States*, 526 U.S. 813, 817 (1999). As such, "[o]rdinarily, a general unanimity instruction is sufficient to protect a defendant's right to a unanimous verdict." *United States v. Liu*, 631 F.3d 993, 1000 (9th Cir. 2011) (citing *United States v. Echeverry,* 719 F.2d 974, 974 (9th Cir. 1983)). "A general unanimity instruction is not sufficient if it appears 'that there is a genuine possibility of jury confusion or that a conviction may occur as the result of different jurors concluding that the defendant committed different acts.'" *Id.* (quoting *Echeverry*, 719 F.2d at 975).

While Petitioner concedes he was asserting the same defense of self-defense to both acts, he argues some jurors may have rejected Petitioner's self-defense claim as to the stabbing while others "may have believed [he] had a right to self-defense" for the stabbing but that it "terminated when [the victim] was knocked to the ground and [Petitioner] kicked him in the head." (ECF No. 12-22 at 23.) The law is clear, though, that jury need not unanimously decide which set of facts make up a particular element of a crime. *Richardson*, 526 U.S. at 817; *McKoy v. North Carolina*, 494 U.S. 433, 449 (1990) (Blackmun, J., concurring) ("[D]ifferent jurors may be persuaded by different pieces of evidence, even when they agree upon the bottom line. Plainly there is no general requirement that the jury reach agreement on the preliminary factual issues which underlie the verdict.") (footnotes omitted); *Evanchyk v. Stewart*, 340 F.3d 933, 937 n.1 (9th Cir. 2003) ("Submitting a multi-

25cv2599 WQH (JAC)

theory crime to the jury without requiring unanimity on any one predicate theory is not a constitutional violation."). Petitioner does not explain how the different considerations regarding his two potentially fatal acts point either to distinct crimes or even different theories of guilt.

Petitioner has not demonstrated, and cannot demonstrate under clearly established federal law, that the state court's decision on the lack of a unanimity instruction here violated due process. Petitioner's principal analysis attacks a state law precedent accepting a similar proposition to those stated in the federal authorities stated immediately above: namely, "[w]here there are multiple acts which a jury may use as the basis for a single crime, a unanimity instruction[]" is not required where "the acts are 'substantially identical in nature,' such that the jury has no basis to distinguish between them." (ECF No. 12-22 at 27 (citing *People v. Beardslee*, 53 Cal.3d 68, 93 (Cal. 1991)).) It was not unreasonable for the Court of Appeal to understand that the continuous course of conduct exception applied to two acts close in time in the same violent encounter for which Petitioner asserted the same defense.[7]

Further, any error in this regard would have been clearly harmless. When a state criminal court allegedly causes a constitutional violation by failing to instruct, a federal habeas court must determine whether the alleged error had a "substantial and injurious effect or influence in determining the jury's verdict." *Penry v. Johnson,* 532 U.S. 782, 795 (2001) (quoting *Brecht v. Abramson,* 507 U.S. 619, 637 (1993)); *California v. Roy,* 519 U.S. 2, 5–6 (1996). Any due process violation arising from the failure to give a unanimity

---

[7] Another way to describe this is similar to the following Central District of California case:

> [T]he question of whether a unanimity instruction on this issue was necessary was a matter of state law is not reviewable in a federal habeas proceeding. *See Estelle v. McGuire*, 502 U.S. 62, 68 (1991); *see also Jimenez v. Diaz*, 592 F. App'x 594, 595 (9th Cir. 2015) (failure to give unanimity instruction *sua sponte* does not present a federal question); *Hassan v. Morawcznski*, 405 F. App'x 129, 131–32 (9th Cir. 2010) (state court determination that court did not err in omitting unanimity instruction is binding interpretation of state law).

*Panasian v. Sutton*, No. 20-cv-6022-VBF (AGR), 2024 WL 3851859, at *18 (C.D. Cal. May 21, 2024), *r. &. r. adopted,* 2024 WL 3859984 (Aug. 16, 2024).

instruction in this regard would be harmless because the neck stabbing and the kick were so closely connected to each other. Thus, any possibility that the jurors disagreed as to which physical strike in a series of extremely violent conduct supported a finding that Petitioner, could not have had a substantial and injurious effect or influence on their verdicts. *Brecht,* 507 U.S. at 637; *Roy,* 519 U.S. at 5–6. Any possible conclusion to the contrary is "beyond any possibility for fairminded disagreement," as required to warrant relief under AEDPA. *Harrington*, 562 U.S. at 103. Therefore, Petitioner is not entitled to habeas relief as to Claim 2.

### 3. Claim 3

In Claim 3, Petitioner asserts the trial court erred in admitting evidence of lack of remorse, which violated Petitioner's federal constitutional right to Due Process under the Fourteenth Amendment. (FAP 8.) The California Court of Appeal summarized the relevant procedural and factual background as follows:

> The prosecution moved in limine to admit videotape evidence showing that after he was given his rights under *Miranda v. Arizona* . . . . Ramirez told the police officer that he did not know anything about the incident with Hermosillo. The prosecutor also sought to admit a video recording showing Ramirez's demeanor during his detention. The court denied the motion, concluding that evidence was cumulative; however, it allowed that if Ramirez testified, the demeanor evidence could be admissible for impeachment.
>
> At trial, the prosecutor asked Ramirez regarding his interaction with police after they detained him: "You didn't have a care in the world that you just killed somebody?" Next, pointing out that Ramirez fell asleep at the police station, the prosecutor asked him, "You then began snoring like a baby?" The prosecutor again asked Ramirez, "Did you have a care in the world?["] The court sustained defense objections to each of those questions.
>
> During closing arguments, the prosecutor drew no objection when he mentioned Ramirez's demeanor during the police interview: "Then we have the defendant's interview. Look at—watch that again. Look at his demeanor. Listen to his tone. Listen to what he says: 'I don't know nothing,' right? . . . He has no remorse at all for stabbing another human being in the neck. Even if it was justified, is this how you're going to act? And then right afterwards they strip you down, you're wearing a trash bag, and you just lay down and

go to sleep like nothing ever happened, snoring like a baby? Give me a break. Okay. So that's how we know self-defense is not at issue."

2024 WL 1188835, at *3. The California Court of Appeal then determined that the trial court had "carefully circumscribed the evidence of Ramirez's demeanor during his initial interrogation, sustaining defense objections to a series of the prosecutor's questions. The jury was able to observe his demeanor first hand when it reviewed the videotaped interview." *Id.* at *4. The court then cited California Supreme Court precedent to hold that, "[t]o the extent the court permitted limited additional evidence describing his demeanor, there was no error." *Id.* (citing *People v. Smith*, 61 Cal.4th 18 (Cal. 2025)). As in *Smith*, "such evidence was relevant to help the jury assess Ramirez's intent, state of mind, and credibility." *Id.*; *see Smith*, 61 Cal.4th at 45–46.

The admission of evidence is not subject to federal habeas review unless a specific constitutional guarantee is violated or the error is of such magnitude that the result is a denial of the fundamentally fair trial guaranteed by due process. *See Andrew v. White*, 604 U.S. 86, 88, 96 (2025) (citing *Payne v. Tennessee*, 501 U.S. 808, 825 (1991)). Failure to comply with state rules of evidence is neither a necessary nor a sufficient basis for granting federal habeas relief on due process grounds. *Henry v. Kernan*, 197 F.3d 1021, 1031 (9th Cir. 1999).

While Petitioner contends admission of the subject evidence violated due process, (ECF No. 12-22 at 36-37), his argument against the state court's admission determination is unavailing. (ECF No. 12-22 at 33–34.) Although Petitioner testified at trial, he suggests error by analogizing to cases in which the prosecution commented on a defendant's in-court demeanor where the defendant exercised his Fifth Amendment right not to testify. (ECF No. 12-22 at 33–34.) Those authorities therefore are inapposite. And under federal habeas review, a court does not consider whether evidence was properly admitted under state evidentiary rules; its review is limited to whether the admission of challenged evidence "so infused the trial with unfairness as to deny due process of law." *Estelle*, 502 U.S. at 67–68, 75 (quotation marks omitted). Put similarly, a court conducting federal

habeas review does not serve as "a state supreme court of errors; [it] do[es] not review questions of state evidence law." *Jammal v. Van de Kamp*, 926 F.2d 918, 919 (9th Cir. 1991). Limited admission of evidence of Petition's demeanor following arrest and during questioning did not render the trial fundamentally unfair.

Petitioner nonetheless argues "the prosecutor explicitly sought to introduce the evidence to show Ramirez's 'cavalier attitude and lack of remorse,' which the prosecutor argued undermined his claim of self defense." ECF No. 12-22 at 35. But a reasonable jurist could easily conclude that, especially where the court ruled such evidence was admissible, any evidence introduced in this respect had no "substantial and injurious effect or influence in determining the jury's verdict." *Brecht,* 507 U.S. at 637. Petitioner's final claim, therefore, lacks merit; he is not entitled to habeas relief.

## IV. CERTIFICATE OF APPEALABILITY

"The district court must issue or deny a certificate of appealability when it enters a final order adverse to the applicant." Rules Governing § 2254 Cases, Rule 11(a), 28 U.S.C.A. foll. § 2254. "A certificate of appealability should issue if 'reasonable jurists could debate whether' (1) the district court's assessment of the claim was debatable or wrong; or (2) the issue presented is 'adequate to deserve encouragement to proceed further.'" *Shoemaker v. Taylor*, 730 F.3d 778, 790 (9th Cir. 2013) (quoting *Slack v. McDaniel*, 529 U.S. 473, 484 (2000)).

The Court finds issuing a certificate of appealability is not appropriate as reasonable jurists would not find debatable or incorrect the Court's conclusion that all four claims presented by petitioner fail on their merits; nor does the Court find any of the issues presented deserve encouragement to proceed further. *See* 28 U.S.C. § 2253(c); *Slack*, 529 U.S. at 484.

V.   **CONCLUSION AND ORDER**

Based on the foregoing, the Court **DENIES** the FAP and **DENIES** a certificate of appealability. The Clerk of Court shall enter judgment accordingly.

Dated:  July 14, 2026

Hon. William Q. Hayes
United States District Court

25cv2599 WQH (JAC)